1 MANDOUR & ASSOCIATES, APC
2 JOSEPH A. MANDOUR, III (SBN 188896)
  Email: jmandour@mandourlaw.com
3 BEN T. LILA (SBN 246808)
4 Email: blila@mandourlaw.com
  8605 Santa Monica Blvd., Suite 1500
5 Los Angeles, CA 90069
6 Telephone: (858) 487-9300
  Attorneys for plaintiff,
7 API Systems, Inc.
8
9
10 **UNITED STATES DISTRICT COURT**
11 **CENTRAL DISTRICT OF CALIFORNIA**
12
13 ─────────────────────────
14 API Systems, Inc., a California )
   corporation,                  )   **Civil Case No. 8:21-CV-00507**
15                               )
16              Plaintiff,        )   **COMPLAINT FOR COPYRIGHT**
                                 )   **INFRINGEMENT AND BREACH**
17        v.                      )   **OF CONTRACT**
                                 )
18                               )   **DEMAND FOR JURY TRIAL**
19 Clarvue, Inc., a California    )
   corporation,                  )
20                               )
21              Defendant.        )
22                               )
23                               )
24                               )
25 ─────────────────────────

26    Plaintiff API Systems, Inc., by and through its counsel, alleges for its
27 complaint against defendant Clarvue, Inc. as follows:
28

## NATURE OF THE ACTION

1.      This Court has subject matter jurisdiction pursuant to 17 U.S.C. § 501, *et seq*. (copyright infringement) and 28 U.S.C. §§ 1331 (federal question jurisdiction), 1338(a) and 1338(b) and supplemental jurisdiction for state causes of action.

## THE PARTIES

2.      Plaintiff API Systems, Inc. ("API Systems,") is a corporation organized under the laws of the State of California with its principal place of business in Tustin, California.

3.      Defendant Clarvue, Inc. is a corporation organized under the laws of the State of California with, on information and belief, its principal place of business at 17320 Red Hill Avenue, Irvine, California.

## JURISDICTION AND VENUE

4.      This Court has subject matter jurisdiction over this lawsuit under 28 U.S.C. § 1338, because, *inter alia,* the action arises under the copyright laws of the United States.

5.      This Court has personal jurisdiction over defendant Clarvue, Inc., because it is a California corporation residing in California.  Also, defendant has transacted business in the Central District of California.  Further, defendant systematically and continuously direct business activities toward and into the Central District of California, including selling the infringing material and entering into a contract with plaintiff.

6.      Venue is proper and reasonable in this district under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to these claims for copyright infringement and breach of contract occurred in this district and defendant has significant contacts with the district.

### FACTS

7.     Plaintiff API Systems is a corporation engaged in the development, sale and marketing of software, including software used to generate customizable surveys, user forms and databases.

8.     API Systems' software may be hosted on internet-accessible web servers for client companies in a variety of industries to use to create database management systems.

9.     For example, API Systems' software has been used by companies in the facility management industry to allow property management companies to provide a platform where workflow can be managed in databases.

10.     In 2005, certain software entitled SURVEY Web Code (the "2005 SURVEY Web Code") was created and subsequently assigned to API Systems.

11.     API Systems' work is the subject of U.S. Copyright Registration No. TX0008830022.  A true and correct copy of said copyright registration is attached hereto as Exhibit A.

12.     An exemplary and true and correct copy of a portion of the 2005 SURVEY Web Code is attached hereto as Exhibit B.

13.     In 2019, API Systems licensed and delivered software comprising the copyrighted 2005 SURVEY Web Code (the "2019 SURVEY Web Code") to Clarvue.

14.     On March 21, 2020, API Systems and Clarvue formalized the license by entering into a Limited Software License Agreement ("Software Agreement"). A true and correct copy of the Software Agreement is attached hereto as Exhibit D.

15.     The Software Agreement, among other things, provides Clarvue with a license to software entitled "nFormz" comprised of 2019 SURVEY Web Code. The 2019 SURVEY web code comprises nearly all the protectable portions of the 2005 SURVEY Web Code and contains further improvements.

16.     API Systems delivered the 2019 SURVEY Web Code in compiled, executable object code format to Clarvue.

17.     On information and belief, in or around May 2020, Clarvue, its employees and contractors proceed to reverse engineer, replicate, and copy API's object code to generate the source code version of the 2019 SURVEY Web Code.

18.     The Software Agreement explicitly provides that Clarvue shall not reverse engineer the 2019 SURVEY Web Code.  The Software Agreement further provides that Clarvue shall not make any derivative works based on API Systems' copyrighted material.

19.     An exemplary, true and correct copy of Clarvue's infringing code is attached hereto as Exhibit C.  On information and belief, the infringing code will generate output that is substantially similar to the output of the copyrighted code in Exhibit B.

20.     API Systems uses the copyright symbol, ©, on its copyrighted works, including the SURVEY Web Code.

21.     Defendant's copying, republication and exploitation of plaintiff's copyrighted work(s) was without authorization from plaintiff.  Defendant's copying was willful, oppressive, malicious and with wrongful intent to infringe the rights of plaintiff.

## **CLAIMS OF RELIEF**

### **FIRST CLAIM OF RELIEF**

### **(Copyright Infringement – 17 U.S.C. § 501)**

22.     Plaintiff repeats and incorporates by reference the statements and allegations in paragraphs 1 to 21 of the complaint as though fully set forth herein.

23.     At all times relevant hereto, plaintiff has been the owner, author and/or assignee of all copyright rights or rights to assert copyright claims for its works and all derivative works.

24.     Without authorization, defendant used, copied, reproduced, and

republished the copyrighted material.  Defendant's copying, reproduction, and republication were commercial in character and purpose.  Defendant either completely or substantially used plaintiff's copyrighted content.  Because the copying was for commercial purposes, it did not constitute fair use under any doctrine of copyright law.

25.   Plaintiff did not authorize defendant's copying, displaying, or republishing of the works.  Defendant infringed the copyrights of plaintiff's creative works by, *inter alia,* reproducing, republishing, publicly displaying, and creating derivates of the works.

26.   As a result of defendant's infringement, plaintiff has suffered, and will continue to suffer, substantial losses.

27.   Defendant knew the infringed works belonged to plaintiff and that they did not have authorization to exploit plaintiff's works.  Defendant's infringements were, therefore, willful.

28.   On information and belief, defendant induced, caused and materially contributed to the infringing acts of others by encouraging, inducing, allowing, and assisting others to reproduce and republish plaintiff's works.  Further, on information and belief, defendant had knowledge of the infringing acts of others relating to plaintiff's copyrighted works.

29.   On information and belief, defendant has the right and ability to control the infringing acts of the individuals and entities that directly infringed plaintiff's works.  Further, on information and belief, defendant obtained a direct financial benefit from the infringing activities of the individuals or entities that directly infringed plaintiff's works.

30.   Defendant's actions, as set forth above, constitute copyright infringement in violation of the Copyright Act, 17 U.S.C. § 501, *et seq.*, all to the damage of plaintiff as previously alleged.

31.   By reason of the foregoing unlawful acts recited in the above

paragraphs, plaintiff has been irreparably harmed and will continue to suffer damage until an appropriate injunction and damages award are imposed by this Court against defendant.

## SECOND CLAIM OF RELIEF

### (Breach of Contract)

32.     Plaintiff repeats and incorporates by reference the statements and allegations in paragraphs 1 to 31 of the complaint as though fully set forth herein.

33.     Plaintiff and Defendant entered into the Software Agreement.

34.     Plaintiff did all, or substantially all, of the significant terms that the contract required.

35.     Defendant was required by the terms of the Software Agreement to, *inter alia,* not reverse engineer the 2019 SURVEY Web Code and not create derivative works based on the SURVEY Web Code.

36.     Defendant breached the Software Agreement by, *inter alia,* using and retaining the 2019 SURVEY Web Code beyond the license term and reverse engineering the 2019 SURVEY Web Code.

37.     Plaintiff was harmed by defendant's breach including defendant's failure to pay license fees.  Defendant's breach of the Software Agreement was a substantial factor in causing plaintiff's harm.

38.     Defendants' actions, as set forth above, constitute breach of contract, all to the damage of plaintiff as previously alleged.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff asks that this Court grant judgment against defendants for the following:

A.     Defendant, its officers, agents, servants, employees, and attorneys, and all persons in active concert or participation with any of them, be

permanently enjoined from:

  i.    infringing plaintiff's copyrighted works;

  ii.   indirectly, contributorily, or vicariously infringing plaintiff's copyrighted works; and,

  iii.  conspiring, encouraging, inducing, allowing, abetting, or assisting others in performing any of the activities referred to in subparagraphs (i) - (ii) above.

B.    Defendant shall file with the Court and serve on plaintiff, within 30 days after the entry and service on defendant of an injunction, a report in writing and attested to under penalty of perjury setting forth in detail the manner and form in which defendants has complied with the provisions of subparagraph (A) above.

C.    Plaintiff be awarded statutory damages for prosecuting this action.

D.    Plaintiff recovers all damages it has sustained as a result of defendant's infringement.

E.    Plaintiff be awarded enhanced damages due to defendant's willful infringement.

F.    Plaintiff be awarded its reasonable attorneys' fees for prosecuting this action to the full extent allowable by 17 U.S.C. § 505, the Software Agreement or other related statute.

G.    Plaintiff recovers its costs of this action and pre-judgment and post-judgment interest, to the full extent allowed by law.

\\
\\
\\
\\
\\
\\

H.     Plaintiff receives all other relief the Court deems appropriate.

                              Respectfully submitted,

Date: <u>March 18, 2021</u>        MANDOUR & ASSOCIATES, APC


                              _____/s/ Ben T. Lila_____
                              Ben T. Lila (SBN 246808)
                              Email: blila@mandourlaw.com
                              Attorneys for plaintiff,
                              API Systems, Inc.

## **DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a trial by the jury on its claims herein and all issues and claims so triable in this action.


Respectfully submitted,

Date: <u>March 18, 2021</u>          MANDOUR & ASSOCIATES, APC


          <u>      /s/ Ben T. Lila                    </u>
          Ben T. Lila (SBN 246808)
          Email: blila@mandourlaw.com
          Attorneys for plaintiff,
          API Systems, Inc.

**EXHIBIT A**

Civil Case No. 8:21-CV-00507
EXHIBIT A

# Certificate of Registration



This Certificate issued under the seal of the Copyright Office in accordance with title 17, *United States Code,* attests that registration has been made for the work identified below. The information on this certificate has been made a part of the Copyright Office records.



Acting United States Register of Copyrights and Director

**Registration Number**

## TX 8-830-022

**Effective Date of Registration:**
October 31, 2019
**Registration Decision Date:**
January 30, 2020

---

**Title**

Title of Work: SURVEY Web Code

**Completion/Publication**

Year of Completion: 2005
Date of 1st Publication: May 26, 2006
Nation of 1st Publication: United States

**Author**

• Author: John O'Donald
Author Created: computer program
Work made for hire: No
Domiciled in: United States
Year Born: 1972

**Copyright Claimant**

Copyright Claimant: API Systems Inc.
12480 Butler Way, Tustin, CA, 92782, United States
Transfer statement: By written agreement

**Certification**

Name: Todd Chvat
Date: October 31, 2019

---

Correspondence: Yes
Copyright Office notes: Regarding title information: Registration extends only to titles listed in the certificate.

Page 1 of 2

Civil Case No. 8:21-CV-00507
EXHIBIT A

# EXHIBIT B

Civil Case No. 8:21-CV-00507
EXHIBIT B

```
21387                      'Add values
21388                      hPermission.Add("ProjectUserID", dr("ProjectUserID"))
21389                      hPermission.Add("RoleID", dr("RoleID") & "")
21390                      hPermission.Add("DefaultViewID", dr("DefaultviewID"))
21391                      hPermission.Add("DefaultFilterID", dr("DefaultFilterID"))
21392                      hPermission.Add("HiddenFilterID", dr("HiddenFilterID"))
21393                      hPermission.Add("StaticView", dr("Staticview"))
21394                      hPermission.Add("StaticFilter", dr("StaticFilter"))
21395                      hPermission.Add("CanCreate", dr("CanCreate"))
21396                      hPermission.Add("CanDelete", dr("CanDelete"))
21397                      hPermission.Add("CanArchive", dr("CanArchive"))
21398                      hPermission.Add("CanMoveFiles", dr("CanMoveFiles"))
~~~~

483                    'AddCell
484                    AddCell(tr, "", , , , , UnitType.Pixel, 25)
485                    AddCell(tr, "<B>Field</B>  ")
486                    AddCell(tr, "<B>Type</B>  ")
487                    AddCell(tr, "<B>Abbreviation</B>  ")
488                    AddCell(tr, "<B>Sheet</B>  ")
489                    AddCell(tr, "<B>Section</B>  ")
490                    AddCell(tr, "<B>Criteria</B>  ")
491                    AddCell(tr, " <B>And/Or</B> ", , , HorizontalAlign.Center)
492                    AddCell(tr, " <B>Exclusions</B> ", , , HorizontalAlign.Center)
493                    AddCell(tr, "")

17897                  'AddCell
17898                  AddCell(tr, "", , , , , UnitType.Pixel, 5)
17899                  AddCell(tr, "<B>Field</B>  ")
17900                  AddCell(tr, "<B>Abbr.</B>  ")
17901                  AddCell(tr, "<B>Sort Order</B>  ", , , , , , , , False)
17902                  AddCell(tr, "<B>Type</B>  ")
17903                  AddCell(tr, " <B>Mode</B> ", , , HorizontalAlign.Center)
17904                  AddCell(tr, " <B>Calendar</B> ", , , HorizontalAlign.Center)
17905                  AddCell(tr, " <B>Expression?</B> ", , , HorizontalAlign.Center)
17906                  AddCell(tr, " <B>Trigger</B> ", , , HorizontalAlign.Center)
17907                  AddCell(tr, " <B>Main List</B> ", , , HorizontalAlign.Center, , , , False)
17908                  AddCell(tr, " <B>Search</B> ", , , HorizontalAlign.Center)
17909                  AddCell(tr, "")

1749   CREATE TABLE [dbo].[Project](
1750       [ProjectID] [int] IDENTITY(1,1) NOT NULL,
1751       [GroupID] [int] NOT NULL,
1752       [Project] [varchar](255) NOT NULL,
1753       [ItemAlias] [varchar](50) NULL,
1754       [DefaultViewID] [int] NOT NULL,
1755       [DefaultFilterID] [int] NOT NULL,
1756       [ProjectMode] [int] NOT NULL,
1757       [KeySectionFieldID] [int] NOT NULL,
1758       [AutoGenerationPrompt] [varchar](50) NULL,
1759       [AutoGenerationPrefix] [varchar](25) NULL,
1760       [AutoGenerationFormat] [varchar](25) NULL,
1761       [NewItemFormat] [varchar](25) NULL,
1762       [MobileMode] [int] NOT NULL,
1763       [DisableGlobalFilters] [bit] NOT NULL,
1764       [EnableCalendar] [bit] NOT NULL,
1765       [EnableExport] [bit] NOT NULL,
1766       [EnableForms] [bit] NOT NULL,
1767       [EnableEmail] [bit] NOT NULL,
1768       [EnableDownloads] [bit] NOT NULL,
1769       [EnableArchive] [bit] NOT NULL,
1770       [EnableShortDisplay] [bit] NOT NULL,
1771       [EnableAutoTransfer] [bit] NOT NULL,
1772       [Completed] [bit] NOT NULL,
1773       [CreatedDate] [datetime] NOT NULL,
1774       [CreatedByUserID] [int] NOT NULL,
1775       [UpdatedDate] [datetime] NOT NULL,
1776       [UpdatedByUserID] [int] NOT NULL,
1777    CONSTRAINT [PK_Project] PRIMARY KEY CLUSTERED
1778   (
```

Civil Case No. 8:21-CV-00507

EXHIBIT B

**EXHIBIT C**

Civil Case No. 8:21-CV-00507
EXHIBIT C

```
18002                    Object(E.a)(
18003                    {
18004                        ProjectID: t,
18005                        UserID: h,
18006                        RoleID: 0,
18007                        DefaultViewID: 0,
18008                        DefaultFilterID: 0,
18009                        HiddenFilterID: 0,
18010                        StaticView: !1,
18011                        StaticFilter: !1,
18012                        CanCreate: !1,
18013                        CanDelete: !1,
18014                        CanMoveFiles: !1,
18015                        CanArchive: 0,
18016                        advancedOptionsString: "",
18017                    },

25016        columns: [
25017            { title: "Reorder", name: "drag" },
25018            { title: "Question", name: "Field" },
25019            { title: "Type", name: "Description" },
25020            { title: "Abbr", name: "Abbreviation" },
25021            { title: "Sheet", name: "Sheet" },
25022            { title: "Section", name: "Section" },
25023            { title: "Criteria", name: "CriteriaDescription" },
25024            { title: "And/Or", name: "AndOr" },
25025            { title: "Exclusions", name: "ExclusionCount" },
25026            { title: "Actions", name: "actions" },
25027        ],

33603            columnExtensions: [
33604                { columnName: "drag", width: 100 },
33605                { columnName: "field", width: 200 },
33606                { columnName: "description", width: 100 },
33607                { columnName: "abbreviation", width: "auto" },
33608                { columnName: "fieldMode", width: "auto" },
33609                { columnName: "calendar", width: "auto" },
33610                { columnName: "expression", width: "auto" },
33611                { columnName: "trigger", width: "auto" },
33612                { columnName: "displayInList", width: "auto" },
33613                { columnName: "displayInSearch", width: "auto" },
33614                { columnName: "actions", width: 160, align: "center" },
33615            ],

29653        O = Object(n.useState)({
29654            groupId: p,
29655            project: "",
29656            itemAlias: "",
29657            status: "active",
29658            projectMode: 0,
29659            autoGenerationPrompt: void 0,
29660            autoGenerationPrefix: void 0,
29661            autoGenerationFormat: "-yyMMddHHmmss",
29662            keySectionFieldId: 0,
29663            newItemFormat: "",
29664            mobileMode: 0,
29665            disableGlobalFilters: !1,
29666            enableCalendar: !1,
29667            enableExport: !1,
29668            enableForms: !1,
29669            enableEmail: !1,
29670            enableDownloads: !1,
29671            enableArchive: !1,
29672            enableShortDisplay: !1,
29673            enableAutoTransfer: !1,
29674            userId: l.userId,
29675        }),
```

Civil Case No. 8:21-CV-00507
EXHIBIT C

**EXHIBIT D**

Civil Case No. 8:21-CV-00507
EXHIBIT D

## LIMITED SOFTWARE LICENSE AGREEMENT

**THIS LIMITED SOFTWARE LICENSE AGREEMENT** (the "**Agreement**") is made and entered into as of March 31, 2020 ("**Effective Date**"), by and between API SYSTEMS, INC., a California corporation, with its principal offices at 12480 Butler Way, Tustin, CA ("**Company**"), and CLARVUE, INC., a California corporation, with its principal offices at 17320 Red Hill Avenue, Suite 175, Irvine, CA 92614 ("**Host**").

### RECITALS

A.      Company develops and markets computer software as a service codebase known as "nFormz" (the "**Software**").

B.      Host desires to obtain the right (and Company desires to provide Host the right) to host the Software, in the form of Software as a Product, on Host's platforms (the "**Products**"), which Products are intended to be accessed by End-User subscribers procured by Host, all upon the terms and conditions set forth in this Agreement.

**NOW THEREFORE**, for valuable consideration, receipt of which is acknowledged, Company and Host agree as follows:

### AGREEMENT

1.      <u>DEFINITIONS</u>.

1.1.      **Reserved.**

1.2.      "**End-User(s)**" means individuals who are authorized by Host to access the Software via the Products, for whom subscriptions to the Software via the Products have been purchased, and who have been supplied user identifications and passwords by Host to access the Software via the Products. End-Users may include but are not limited to employees, consultants, contractors and agents of Host, or third parties with which Host transacts business.

1.3.      "**Affiliate**" means any entity which directly or indirectly controls, is controlled by, or is under common control with the subject entity. "**Control**," for purposes of this definition, means direct or indirect ownership or control of more than 50% of the voting interests of the subject entity.

1.4.      "**Software**" means the software described in **<u>Exhibit A</u>** attached to this Agreement, and incorporated by this reference, which together with the related documentation are marketed, distributed, and supported by Company and for which Host is granted a personal, nontransferable, nonexclusive license pursuant to this Agreement.

2.      <u>LIMITED LICENSE AND OWNERSHIP</u>.

2.1.      **License.** Subject to the terms and conditions contained in this Agreement, Company grants Host a personal, nontransferable, nonexclusive license to host the Software on the Products identified on **<u>Exhibit C</u>** attached hereto and incorporated herein by this reference (which **<u>Exhibit C</u>** may be modified from time to time in

Page **1** of **16**

Civil Case No. 8:21-CV-00507
EXHIBIT D

accordance with the terms of this Agreement) for access by End-Users via such Products. Company reserves the right to implement an embedded licensing system to check and verify (whether by remote server or otherwise) each use of the Software (whether via the Products or otherwise). Host shall only use the Software on the Products identified on **Exhibit C** (as amended from time to time in accordance with this Agreement) and for no other use or purpose.

2.2. **Restrictions on License.** Host shall have no right to license, sublicense, assign, or otherwise transfer its rights under this Agreement except as provided in Section 12.1 of this Agreement.

3. <u>FEES AND PAYMENT TERMS</u>.

3.1. **Fees.** Host agrees to pay Company the fees specified in the Host Fee Schedule set forth in **Exhibit B** attached to this Agreement and incorporated by this reference.

3.2. **Taxes.** Any and all fees due to Company pursuant to this Agreement are exclusive of, and Host shall pay and shall indemnify, defend, and hold Company harmless against, any liability for any sales, use, property, license, value-added, withholding, excise, or similar tax, whether federal, state, or local, that may be imposed or assessed in connection with the Software, its delivery, licensing, use, ownership, or possession and any insurance premiums, packing charges, inspection fees, duties, tariffs, imposts, and similar charges, exclusive of taxes based on Company's net income.

3.3. **Payment.** Within fifteen (15) days after the end of each calendar quarter, for the periods commencing on April 1, 2020, Host will pay to Company all License Fees due. In addition, within thirty (30) days of the date of each invoice Company delivers to Host, Host will pay to Company all Support and Development Fees due.

3.4 **Overdue Amounts.** If any amounts due and owing hereunder are not received by Company by the due date, then at Company's discretion, (a) a late charge equal to five percent (5%) of the overdue amount shall be imposed, and (b) such overdue amount shall accrue interest at the rate of one percent (1%) of the outstanding balance per month, or the maximum rate permitted by law, whichever is lower, from the date such payment was due until the date paid.

4. <u>OBLIGATIONS</u>.

4.1. **Keeping Company Informed.** To the extent Host receives actual notice or knowledge, Host shall promptly keep Company fully informed of all governmental, commercial, and industrial activities and plans that do or could affect the Software as it is being utilized via the Products. Host shall consult with Company regarding any advertising or trade practice that might affect the good name, trademarks, ownership, goodwill, or reputation of Company or the Software. At all times during the term of this Agreement, Host shall immediately notify Company of any and all suspected defects, or any malfunctioning, in the Software.

4.2. **Host Obligations.** Host will: (a) be responsible for End-Users' compliance with this Agreement, (b) be solely responsible for the accuracy, quality, integrity and legality of data provided or created by Host and/or End-Users related to and/or arising out of the Software, and of the means (other than the Software) by which they acquired such data, (c) use commercially reasonable efforts to prevent unauthorized access to or use of the Software, and notify Company promptly of any such unauthorized access or use, and (d) use the Software only in accordance

Civil Case No. 8:21-CV-00507
EXHIBIT D

with applicable laws and government regulations. Host is responsible for, and Company's obligation to provide the Software is subject to, Host's fulfillment of the responsibilities and full compliance with the assumptions provided in Article 10. Host will not (i) make the Software available to anyone other than End-Users, (ii) sell, resell, rent, license or lease the Software except as expressly provided in Section 12.1, (iii) use the Software to store or transmit infringing, libelous, or otherwise unlawful or tortious material, or to store or transmit material in violation of third-party privacy rights, or (iv) interfere with or disrupt the integrity or performance of the Software or third-party data contained therein, or (v) attempt to gain unauthorized access to the Software or their related systems or networks. Host accepts sole responsibility for all activity occurring under and/or arising out of the Products. At all times during the term of this Agreement, Host shall provide and maintain adequate capacity (including, without limitation, servers, storage, bandwidth, CPU time and support personnel) and infrastructure (including heating/cooling, electrical power, server hardware, network infrastructure and bandwidth), as necessary to support the Software.

4.3.    **Telecommunications.** Host and/or its End-Users are solely responsible for all of their respective telecommunication or Internet connections required to access the Software and/or Products, any related access or authentication software or devices, as well as all hardware and software on Host's premises. In addition to other third party costs that may apply, Host and End-Users agree to pay for any and all of their respective telecommunications costs, license fees and service fees required for and dedicated to Host's and End-Users' respective use and access to the Software and Products.

4.4.    **Host Use of Third-Party Applications.** Any acquisition by Host of third-party products or services, and implementation, customization and other consulting services, and any exchange of data between Host and any third-party provider, are solely between Host and the applicable third-party provider. Company does not warrant or support third-party products or services. If Host installs or enables third-party applications for use with the Software, Host assumes any and all risks associated with such use. Host will be responsible for supplying any consents or authorizations required for Host's use of such third party applications.

4.5    **Company Obligations.** Except as otherwise expressly set forth in this Agreement, Company shall ensure the Software is operational on the Products as required by this Agreement and to provide the support and services identified in Exhibit B upon request from Host during the term of this Agreement. Company shall use reasonable efforts to promptly respond during the business hours of 9 AM to 5 PM (Pacific Time). Monday through Friday, excluding all Federal holidays, to requests by Host for support for End-Users, and use reasonable efforts to resolve any operational of the Software via the Products.

5.    <u>TERM AND TERMINATION.</u>

5.1.    **Term.** The term of this Agreement shall commence on April 1, 2020 and expire on December 31, 2020, unless sooner terminated pursuant to this Agreement. The parties may renew this Agreement upon execution of a mutual agreement in writing at least ninety (90) days prior to the expiration of the term.

5.2.    **Termination by Either Party.** Either party has the right, in addition and without prejudice to any other rights or remedies, to terminate this Agreement as follows:

5.2.1.    By Company, immediately upon written notice, if Host fails to timely pay any amounts due to Company pursuant to this Agreement following fifteen (15) days' written notice to Host;

Page **3** of **16**

Civil Case No. 8:21-CV-00507
EXHIBIT D

5.2.2.   By Company, upon fifteen (15) days' written notice, if there is a change in Control of Host, whether by sale of assets, stock, or otherwise;

5.2.3.   By either party, immediately upon written notice, if the other party commits any material breach of the terms of this Agreement that, in the case of a curable breach (except as set forth in 5.2.1), shall not have been cured within thirty (30) days after the receipt by the party in default of notice specifying the breach and requiring its remedy (provided that, in the event such cure cannot be reasonably completed within said 30-day period, then the defaulting party shall commence to cure such breach within said 30-day period and thereafter continuously and diligently pursue such cure to completion, which in no event shall exceed one hundred twenty (120) days after the party in default's receipt of said notice specifying the breach); or

5.2.4.   By Company, immediately upon written notice if: (a) all or a substantial portion of the assets of the Host are transferred to an assignee for the benefit of creditors, to a receiver, or to a trustee in bankruptcy; (b) a proceeding is commenced by or against Host for relief under the bankruptcy or similar laws and such proceeding is not dismissed within sixty (60) days; or (c) Host is adjudged bankrupt.

5.3.   **Rights on Termination.** Company has and reserves all rights and remedies that it has, by operation of law or otherwise, to enjoin the unlawful or unauthorized marketing, distribution, licensing, sublicensing, copying, modification, or use of the Software. On termination, all rights granted to Host under this Agreement shall immediately cease and Host shall immediately cease all marketing, distribution, licensing, sublicensing, modification, and use of the Software, and Host will promptly return to Company all copies (both in digital and hard copy formats) of the Software in Host's possession, including the removal of the Software (including, without limitation, any modifications or iterations thereof) from any and all Products, and so certify to Company in writing within fourteen (14) days of termination. Sections 3, 7, 8, 9, and 10 will survive termination or expiration of this Agreement as will any cause of action or claim of either party, whether in law or in equity because of any breach or default.

5.4.   **No Other Rights on Termination.** The parties understand and agree that Host may incur losses and damages in the event of termination. The parties agree to these termination provisions with full knowledge of such possibility of losses and damages in the event of termination and, except as specifically provided in this Agreement, Company shall not be responsible to Host for compensation, damages, or otherwise in the event of a termination. Host understands and acknowledges that any contracts or other arrangements it enters into with any third parties, including, without limitation, End-Users, with respect to the Software will be subject and subordinate to the rights of termination set forth in this Agreement. Host will indemnify, defend and hold Company harmless from any and all liability, loss, damages, costs, or expenses incurred by Company in connection with claims by any third party, including, without limitation, any End-User, made because of the termination of this Agreement.

5.5.   **Effect of Termination.** Termination or expiration of this Agreement will not affect Host's obligations under the Agreement that have accrued prior to termination or expiration thereof, including, without limitation, the payment of any sums due to Company, or any obligations that expressly survive the termination or expiration of this Agreement, including, without limitation, the confidentiality obligation of Host under Article 10 of this Agreement.

Page 4 of 16

Civil Case No. 8:21-CV-00507
EXHIBIT D

5.6.   **Host's Duties Upon Termination.** Upon termination or expiration of this Agreement, Host agrees to do the following:

5.6.1.   Refrain from representing itself as a distributor or licensee of Company or using any trademarks or trade names of Company;

5.6.2.   Return to Company or immediately destroy all advertising matter and other printed material in Host's possession or under Host's control containing or bearing any trademark or trade names of Company;

5.6.3.   Take all appropriate steps to remove and cancel Host's listing in telephone books, directories, public records, or elsewhere that state or indicate that Host is a distributor or licensee of Company; and

5.6.4.   Removal of the Software (including, without limitation, any modifications or iterations thereof) from any and all Products or other platforms of Host.

5.7.   **Suspension.** In addition to all other rights and remedies set forth in this Agreement and/or provided by law, if any amount owing by Host is fifteen (15) days or more overdue or if Host is in default of any other provision of this Agreement, Company may (but shall not be obligated), without limiting its other rights and remedies, suspend any or all of the license provided to Host hereunder (which shall include, but not be limited to, suspension of Host's and End-User's use of and access to the Software whether via the Products or not) until Host is in compliance with its obligations under this Agreement. Nothing contained in this Section 5.7 shall prevent or prohibit Company from (nor shall this Section 5.7 be construed as a prerequisite to Company) terminating this Agreement in accordance with Section 5.2

6.   CHANGES, MODIFICATIONS AND COMPANY ACCESS.

6.1.   **Scheduled Changes.** At all times during the term of this Agreement, Company reserves the right to make modifications, including upgrades, patches, revisions or additions to the Software. If Company thereby significantly modifies, revises, adds to or otherwise changes the functionality of the Software in any material respect (collectively, a "**Change**"), Company will notify Host at least thirty (30) days prior to such Change. Company reserves the right to amend the Exhibits to this Agreement in order to reflect Changes. However, Company may make Changes without such notice to the extent Company deems immediate action is required to: (i) correct or avoid identified security vulnerabilities and/or issues that have or are reasonably likely to become errors affecting the Software; or (ii) comply with applicable law.

6.2.   **Configuration Changes.** At all times during the term of this Agreement, Company reserves the right to modify settings, configuration files, reports, and similar aspects of the Software as Company deems necessary to maintain the operation of the Software. Such configuration changes which do not materially affect existing functionality will not be subject to the notice and testing periods identified in Section 6.1 above.

6.3.   **Company Access.** At all times during the term of this Agreement, Host shall provide root access (remotely via VPN) and data center access to all of Host's physical servers containing Products, and administrator-level access to iTunes connect and Google Play related to such Products for purposes of updating mobile applications for such Products.

Page **5** of **16**

Civil Case No. 8:21-CV-00507
EXHIBIT D

6.4.    **Limitation on Company Use of End-User Information.**  Company agrees to use reasonable efforts to insure that all End-User identifying information located on the Products is used solely for the purposes set out in this Agreement and that Company will not use or copy any information pertaining to Host's End-Users (except as required to ensure operation of the Software via the Products as required herein) or disseminate such information to any third party or for any purpose other than those expressly permitted herein.  Company further represents and agrees that Company's access via any embedded systems shall not interfere with the operation of the Software via Host's Products, as required herein.

7.      <u>DISCLAIMER OF WARRANTIES AND LIMITATION OF LIABILITY.</u>

7.1.    **Limited Warranty.**  Company warrants that the Software will substantially conform to the specifications in <u>Exhibit A</u> for ninety (90) days following the date the Software is made available to Host. This warranty does not apply if the Software: (i) has been altered, except by Company or its authorized representative, (ii) has not been installed, operated, repaired, or maintained as instructed by Host, (iii) has been subjected to misuse, negligence, or accident; (iv) is for beta, evaluation, testing or demonstration purposes or other circumstances for which Company does not receive a payment of a License Fee or other amount required by this Agreement; or (v) has not been provided by Company.

7.2.    **Disclaimer.** COMPANY PROVIDES THE SOFTWARE "AS IS" AND EXPRESSLY DISCLAIMS ALL WARRANTIES, CONDITIONS OR OTHER TERMS, WHETHER EXPRESS, IMPLIED OR STATUTORY, INCLUDING WITHOUT LIMITATION, WARRANTIES, CONDITIONS OR OTHER TERMS REGARDING MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, DESIGN, CONDITION, CAPACITY, PERFORMANCE, TITLE AND NON INFRINGEMENT. COMPANY DOES NOT WARRANT THAT THE SOFTWARE WILL OPERATE UNINTERRUPTED OR ERROR-FREE OR THAT ALL ERRORS WILL BE CORRECTED. IN ADDITION, COMPANY DOES NOT WARRANT THAT THE SOFTWARE OR ANY EQUIPMENT, SYSTEM OR NETWORK ON WHICH THE SOFTWARE IS USED WILL BE FREE OF VULNERABILITY TO INTRUSION OR ATTACK.

7.3.    **Exclusive Remedies.** Host's exclusive remedy, and Company's entire liability, for any breach of the warranties in Section 7.1 above shall be the correction of Software errors. If Company is unable to make the Software operate substantially as warranted in Section 7.1 within the notice and cure period provided in Section 5.2.3, Host is entitled to return the Software and obtain reimbursement of the applicable fees paid to Company solely for the period of time in which the Software does not operate substantially as warranted (in no event to exceed an amount equal to the applicable fees paid to Company for the thirty [30] days immediately preceding Host's return of the Software pursuant to this Section 7.3), which shall be Host's sole and exclusive remedy for such breach.

7.4.    **Limitation of Liability.** IN NO EVENT SHALL COMPANY BE LIABLE FOR ANY INDIRECT, INCIDENTAL, SPECIAL, OR CONSEQUENTIAL DAMAGES, INCLUDING LOSS OF PROFITS, REVENUE, DATA, OR USE, INCURRED BY HOST, ANY END-USER, OR ANY THIRD PARTY, WHETHER IN AN ACTION IN CONTRACT OR TORT OR BASED ON A WARRANTY, EVEN IF THE HOST, END-USER, OR ANY OTHER PERSON HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. COMPANY SHALL HAVE NO LIABILITY WHATSOEVER, INCLUDING FOR ANY DIRECT, INDIRECT, INCIDENTAL, SPECIAL, OR CONSEQUENTIAL DAMAGES, RELATED TO OR ARISING OUT OF (1) THE SOFTWARE ALTERED BY OR ON BEHALF OF HOST, (2) DATA LOSS/CORRUPTION, HARDWARE FAILURES, APPLICATION DOWNTIME, QUALITY OF SERVICE, FAILED PENETRATION TESTS OR SECURITY SCANS, HACKING, EXPOSURE OF SENSITIVE DATA OR ANY OTHER EXTERNAL/UNKNOWN THREATS THAT AFFECT SYSTEM SECURITY, PERFORMANCE AND AVAILABILITY, (3) INABILITY TO SATISFY HOST'S TECHNICAL REQUIREMENTS, OR HOST'S POOR

Page **6** of 16

Civil Case No. 8:21-CV-00507
EXHIBIT D

SYSTEM PERFORMANCE/DOWNTIME AS A RESULT OF HARDWARE/SOFTWARE TECHNICAL LIMITATIONS, (4) COMPANY'S REFUSAL TO IMPLEMENT HOST'S PROPOSED TECHNICAL ENHANCEMENTS, (5) ANY FEES, COSTS AND EXPENSES RELATED TO THE PRODUCTS, INCLUDING WITHOUT LIMITATION, THIRD PARTY LICENSES, THIRD PARTY SERVICES (E.G., SECURITY SCANS, PENETRATION TESTS, SECURITY CERTIFICATIONS, ETC.), SUBSCRIPTION AND OTHER AGREEMENTS BETWEEN HOST AND ANY END-USER AND/OR THIRD PARTY, ENCRYPTION CERTIFICATES, HARDWARE, SERVERS, AND UTILITIES. HOST ASSUMES ANY AND ALL RISKS AND LIABILITIES RELATED TO OR ARISING OUT OF ANY ALTERATION OF THE SOFTWARE AND ANY FEES, COSTS, EXPENSES AND AGREEMENT BETWEEN HOST AND ANY END-USER AND/OR THIRD PARTY. COMPANY'S LIABILITY FOR DAMAGES UNDER THIS AGREEMENT SHALL IN NO EVENT EXCEED THE AMOUNTS ACTUALLY PAID BY HOST TO COMPANY UNDER THIS AGREEMENT. THIS LIMITATION OF LIABILITY ALLOCATES THE RISKS UNDER THIS AGREEMENT BETWEEN COMPANY AND HOST. COMPANY'S PRICING REFLECTS THIS ALLOCATION OF RISK AND THE LIMITATION OF LIABILITY SPECIFIED IN THIS SECTION.

8.    INDEMNITY.

8.1.    **Infringement Indemnity.** Company indemnifies, defends, and holds Host harmless from and against any claims, actions, or demands alleging that the Software infringes any patent, copyright, or other intellectual property right of a third party. If use of the Software is permanently enjoined for any reason, Company, at its option and in its sole discretion, may: (a) modify the Software so as to avoid infringement; (b) procure the right for Host to continue to use the Software; or (c) terminate this Agreement. Company shall have no obligation under this Section 8.1 with respect to claims, actions, or demands alleging infringement as a result of: (a) the combination of noninfringing items supplied by Company with any items not supplied by Company; (b) modification of the Software by Host or by Company in compliance with Host's instructions; and (c) continued allegedly infringing activity by Host after Host has been notified of such possible infringement.

8.2.    **Host's Indemnity.** Host indemnifies, defends, and holds Company and its Affiliates and their respective principals, shareholders, members, partners, directors, officers, employees, agents, representatives, predecessors, successors, assigns, and any and all persons or entities acting by or through Company, harmless from and against any claims, actions, liabilities, damages or demands related to and/or arising out of Host's or its End Users' marketing, use, or alteration of the Software, the use, operation and/or existence of the Products and any software or hardware related thereto, and any agreements or monies due and owing between Host and End-Users and/or any third parties.

9.    PROPRIETARY RIGHTS.

9.1.    **Ownership of Proprietary Rights.** Company retains all of its rights, title to, and ownership of all copyrights, trademarks, trade secrets, patents, and all other intellectual property relating or applying to the Software and any improvements or enhancements thereof. Unless otherwise expressly set forth in this Agreement, Host has no right, title, or ownership interest in the Software or any intellectual property relating to the Software and shall not copy, reproduce, reverse engineer, decompile, disassemble, or otherwise use all or part of the Software. Company will retain exclusive ownership of (including all intellectual property rights contained therein) any ideas, concepts, know-how, techniques, expertise, tools, methods, or other materials used in connection with the Software: (a) that have been previously developed or are separately developed by Company; (b) that represent an improvement, change, modification, or enhancement thereof; or (c) that are authored, created, invented, developed or reduced to practice by Company. Host agrees to assign, and upon creation thereof automatically assigns, to Company, its successors and assigns, ownership of all such rights in their entirety, without further consideration.

Page **7** of **16**

Civil Case No. 8:21-CV-00507
EXHIBIT D

From time to time upon Company's request and at Company's expense, Host and/or its personnel agree to confirm such assignments by execution and delivery of written documentation in the form provided by Company.

      9.2.    **No Modification.** With respect to the Software, Host may not alter, modify, change, reverse engineer, decompile, remove any copyright notices, alter any embedded HTML/JavaScript/images, or alter or delete system activity information for the purposes of concealing usage, each of which is absolutely prohibited.

      9.3.    **Trademarks and Trade Names.** Host may use the trade names in **Exhibit D** attached to this Agreement, and incorporated by this reference, as amended from time to time by Company. Host acknowledges the validity of the trademarks and trade names and Company's ownership of the trade names and trademarks and agrees not to challenge Company's rights to use the trademarks or trade names that Company uses in connection with the Software and to indicate by the proper symbol that all such trademarks or trade names are proprietary to Company.

      9.4.    **Maintenance and Preservation of Trademarks.** Host agrees to comply with Company's reasonable requirements in connection with obtaining, maintaining, enforcing, or preserving any of Company's trademarks, trade names, or other proprietary rights. However, only Company has the right to enjoin any infringement or registration by a third party of the trademarks, trade names, or other proprietary rights.

      9.5.    **Limitation on Use of Names.** Host agrees not to use the trademarks, trade names, or other marketing names of Company, or any confusingly similar work or symbol, as part of Host's own name or the names of the products it markets without Company's consent, which may be withheld at Company's absolute discretion.

      9.6.    **Copyrights.** Company reserves the right to place copyright notices and symbols in any and all applications of the Software, including, without limitation, applications visible to End-Users, and Host shall not alter such notices and symbols in any manner whatsoever. Any copyright notice by Company shall not be placed to cover or distort Host's copyright notices.

10.    <u>CONFIDENTIALITY AND NON-SOLICITATION.</u>

      10.1.    **Confidentiality of Company Confidential Information.** Host acknowledges that the Software and all information relating to the business and operations of the Company that Host learns in connection with this Agreement is the valuable, confidential, and proprietary information of the Company (the "**Company Confidential Information**"). Host, for itself, its employees, contractors, consultants, and agents, agrees to: (a) safeguard the Company Confidential Information with the same degree of care that Host uses to protect its own confidential information; (b) maintain the confidentiality of this information; (c) not use such information except as permitted under this Agreement; and (d) not disseminate, disclose, sell, publish, or otherwise make available this information to any third party without the prior written consent of Company.

      10.2.    **Confidentiality of Host and End-User Confidential Information.** Company acknowledges that all information relating to the business and operations of Host, and all data and other information stored by Host's End-Users on the Products that Company learns in connection with this Agreement (the "**Host and End-User Confidential Information**"), is the valuable, confidential, and proprietary information of the Host or the Host's End-User, respectively. Company, for itself, its employees, contractors, consultants, and agents, agrees to: (a) safeguard the Host and End-User Confidential Information with the same degree of care that Company uses to protect its own confidential information; (b) maintain the confidentiality of this information; (c) not use such information except as permitted under this Agreement; and (d) not disseminate, disclose, sell, publish, or otherwise

Civil Case No. 8:21-CV-00507
EXHIBIT D

make available this information to any third party without the prior written consent of Host or the End-User, as applicable.

10.3.   **Limitations on Confidentiality Restrictions.** Sections 10.1 and 10.2, above, will not apply to any information that: (a) is already lawfully in  possession of the receiving Party (unless received pursuant to a nondisclosure agreement); (b) is or becomes generally available to the public through no fault of the receiving Party; (c) is disclosed to a receiving Party by a third party who may transfer or disclose such information without restriction; (d) is required to be disclosed by a receiving Party as a matter of law (provided that the receiving Party from whom disclosure is sought will use all reasonable efforts to provide the other Party with prior notice of such disclosure and to obtain a protective order); (e) is disclosed by a receiving Party with the other Party's approval; and (f) is independently developed by a receiving Party without any use of confidential information. In all cases, receiving Party will use all reasonable efforts to give the other Party ten (10) days' prior written notice of any disclosure of information under this Agreement. Notwithstanding anything to the contrary in this Agreement, the following shall not be deemed Host and End-User Confidential Information: (a) the identity of any End-User or its employees and/or agents; (b) the fact that an End-User uses or has used the Software; and (c) Company's ownership of the Software as set forth in Section 9.1 above, including, without limitation, any improvements, modifications or enhancements of the Software, whether performed in the past, present or future, and/or whether performed during term of this Agreement and/or at the request of Host and/or any End-User.

10.4.   **Injunctive Relief for Breach.** Company and Host acknowledge that any breach of Section 10.1 or 10.2 will irreparably harm the Party whose confidential information may be disclosed by such breach. Accordingly, in the event of any breach, the affected Party will be entitled to seek injunctive relief in addition to any other remedies that it may have at law or in equity.

10.5.   **Non-Solicitation.**  So long as Host is not in default of this Agreement and only during the valid term of this Agreement, Company agrees not to solicit any past or present clients and/or End-Users of Host for the purposes of the sale, license or subscription of the Software, unless otherwise consented to in writing by Host. Notwithstanding the foregoing, Company shall not be prohibited in any manner whatsoever from soliciting or contracting regarding the Software with any persons or entities with whom Company had a direct pre-existing business relationship prior to April 1, 2020, including, without limitation, such persons' and entities' subsidiaries, affiliates, parent companies, successors, and assigns. For purposes of clarity, the provisions of this Section 10.5 shall not apply following the termination of this Agreement.

11.   COMPLIANCE WITH LAWS.

11.1.   **Compliance with Laws.**  Host and all End-Users shall comply with any and all federal, state and local laws with respect to their use and access of the Software and Products.

11.2.   **Licenses and Permits.** Host will be responsible for obtaining all necessary governmental authorizations, including, without limitation, any import licenses and foreign exchange permits, with respect to the Software and Products. If requested to do so, Host will provide Company with proof of compliance with all necessary governmental authorization. Host, not Company, will bear all risks and costs if any authorization is delayed, denied, revoked, restricted, or not renewed.

Civil Case No. 8:21-CV-00507
EXHIBIT D

12.     <u>GENERAL.</u>

   12.1.   **Assignment.** Host may not assign or transfer its rights or delegate its obligations under this Agreement without Company's prior written consent, which consent shall be in Company's sole discretion. Company may, without Host's consent, assign this Agreement to its Affiliates and/or any third party, and Company shall be relieved of any future obligations under this Agreement following such assignment. This Agreement shall be binding upon the successors and assigns of the parties hereto.

   12.2.   **Entire Agreement.** This Agreement, along with the Exhibits attached and incorporated herein, embodies the final, complete, and exclusive understanding between the parties, and replaces and supersedes all previous oral or written agreements, understandings, or arrangements between the parties with respect to the subject matter contained in this Agreement. This Agreement may not be modified or amended except in a writing signed by an authorized officer of each party to this Agreement.

   12.3.   **Notices.** Except as otherwise provided in this Agreement, notices required to be given pursuant to this Agreement shall be effective when received, and shall be sufficient if given in writing, hand-delivered, sent by facsimile with confirmation of receipt, sent by First Class Mail, return receipt requested (for all types of correspondence), postage prepaid, or sent by overnight courier service and addressed as follows:

**To Company**:   API Systems Inc. (nFormz)
            Attn: John O'Donald
            12480 Butler Way
            Tustin, CA 92782

**To Host**:    Clarvue, Inc.
            17320 Redhill Ave., Suite 175
            Irvine, CA 92614

   12.4.   **Publicity.** Without the prior written consent of the other party, neither party shall disclose the terms and conditions of this Agreement, except such disclosure may be made as is reasonably necessary to the disclosing party's bankers, attorneys, or accountants or except as may be required by law.

   12.5.   **Force Majeure.** Neither party shall be liable to the other for its failure to perform any of its obligations under this Agreement, except for payment obligations, during any period in which such performance is delayed or rendered impracticable or impossible due to circumstances beyond its reasonable control, including fire or other casualty, acts of God, strike or labor dispute, war or other violence, or any law, order or requirement of any governmental agency or authority (each a "**Force Majeure**"), provided that the party experiencing the delay promptly notifies the other of the delay. Performance time will be considered extended for a period of time equivalent to the time lost because of any such excused delay. If any Force Majeure endures more than ninety (90) days, the parties will meet and review in good faith the desirability and conditions of this Agreement.

   12.6.   **No Joint Venture.** Nothing in this Agreement shall be deemed to create an employer-employee, principal-agent, or joint venture relationship. Neither party shall have the authority to enter into any contracts on behalf of the other party.

   12.7.   **Governing Law and Jurisdiction.** This Agreement shall be governed by and construed in accordance with the laws of the State of California as applied to agreements made between residents of California

Page **10** of **16**

Civil Case No. 8:21-CV-00507
EXHIBIT D

for performance entirely within California. The federal and state courts residing in Orange County, California, shall have jurisdiction over any claim brought under this Agreement, and the parties hereby consent to the personal jurisdiction of such courts.

12.8.    **Severability.** In case any provision of this Agreement shall, for any reason, be held to be invalid, unenforceable, or illegal, such provision shall be severed from this Agreement, and such invalidity, unenforceability, or illegality shall not affect any other provisions of this Agreement.

12.9.    **Arbitration.** In the event of any dispute between the parties arising out of this Agreement, the dispute shall be resolved by arbitration. If either party desires to initiate a claim to arbitrate a dispute with the other party, the demanding party shall send written notice to the other, providing a description of the dispute, a description of previous efforts to resolve the dispute, all relevant documents and supporting information, and the proposed resolution. The parties agree to make attempts to resolve the dispute prior to filing a claim for arbitration. If the parties cannot resolve the dispute within forty-five (45) days of receipt of the notice to arbitrate, then either party may submit the dispute to formal arbitration. Unless the parties agree otherwise, the arbitration will be conducted by a single, neutral arbitrator with JAMS and will take place in Orange County, California. The arbitration will be governed and conducted by JAMS. The JAMS rules, including rules about the selection of an arbitrator, filing, administration, discovery, and arbitrator fees, will be conducted under JAMS Comprehensive Arbitration Rules & Procedures. The JAMS rules are available on its Web site at www.jamsadr.com as may be modified from time to time. Unless otherwise ordered by the arbitrator, each party is responsible for its own respective costs relating to counsel, experts, and witnesses, as well as any other costs relating to arbitration. Notwithstanding the foregoing, this arbitration provision shall not prevent Company from seeking an injunction in a court of competent jurisdiction in accordance with Section 12.7 above against Host arising out of or relating to this Agreement.

| _____ | _____ |
| Host's Initials | Company's Initials |

12.10.    **Attorney's Fees.** In the event of any dispute between the parties arising out of this Agreement, the prevailing party shall be entitled to recover its attorney's fees and costs.

12.11.    **Waiver and Cumulative Remedies.** No failure or delay by either party in exercising any right under this Agreement will constitute a waiver of that right. Other than as expressly stated herein, the remedies provided herein are in addition to, and not exclusive of, any other remedies of a party at law or in equity.

12.12.    **No Third-Party Beneficiaries.** There are no third-party beneficiaries to this Agreement.

12.13.    **Counterparts.** The parties agree that this Agreement may be executed and/or delivered electronically, and electronic copy or confirmation of this Agreement may be executed by facsimile and in counterparts, which taken together will form one legal instrument.

**[SIGNATURE PAGE CONTINUED BELOW]**

Page **11** of **16**

Civil Case No. 8:21-CV-00507
EXHIBIT D

IN WITNESS WHEREOF, the undersigned have executed and delivered this Agreement by their duly authorized representatives as of the Effective Date.

**COMPANY**:

API SYSTEMS, INC.,
a California corporation

By:_____

Printed Name:_____

Its:_____

**HOST**:

CLARVUE, INC.
A California corporation

By:_____

Printed Name:___ROBIN WALKER___

Its:___C.O.O.___

Page **12** of **16**

Civil Case No. 8:21-CV-00507
EXHIBIT D

**EXHIBIT A**

**SOFTWARE SPECIFICATIONS**

nFormz software is an enterprise web-based application that is designed for data, image and document management, enabling end users to rapidly prototype and deploy their own applications for use on the internet and mobile devices. As of the Effective Date and subject to this Agreement, this application provides:

- End users to choose from 13 different data types and organize their desired workflow using system objects known as Groups, Items, Users, Projects, Sheets, Sections, Views, Filters, Roles, Forms, Layouts, Expressions and Triggers.
- User permission controlled down to the field level, including separate permission models for web and mobile devices.
- Integrated importing, exporting and reporting capability.
- The ability to customize through custom add-ons, executables and scripts providing features such as alerting, dashboard functionality and integration with external systems.

The Parties acknowledge and agree that the nFormz Software subject to this Agreement, and all prior and/or derivative works based thereon, is owned exclusively by Company, Copyright Registration No. TX0008830022 for works entitled "SURVEY Web Code."

Page **13** of **16**

Civil Case No. 8:21-CV-00507
EXHIBIT D

---

**EXHIBIT B**

**HOST FEE SCHEDULE**

---

All fees set forth in this **Exhibit B** shall be paid in accordance with Article 3 of the Agreement.

A. **License Fees.** Host shall pay to Company a license fee equal to Eight Thousand Five Hundred Dollars and 00/100 ($8,500.00) per_month for each of the Products identified on **Exhibit C** to this Agreement (collectively, the "**License Fees**").

B. **Support/Development Fees.** In addition to the License Fees, Host shall pay to Company the following support and development fees:

- **Level 1 Support – No Fee:**

    o Troubleshooting and fixing internal bugs or resolving performance issues in the Software;
    o Answering a limited number of questions via email or phone in Company's discretion and depending on availability; and
    o Ensuring source code is compliant with general security best practices, including but not limited to updating security patches and annual security validation updates (however, this shall not include specific security or other requirements of Host or any End-User, which shall be subject to Level 2 or Level 3 Support).

- **Level 2 Support – First one hundred (100) hours per year at no fee, then any additional hours within such year will be charged hourly at the rates set forth below:**

    o Writing/Debugging html layouts and JavaScript and creating graphics in the Software;
    o Writing/Debugging expressions in the Software;
    o Configuring projects, filters, roles, permissions, and forms in the Software;
    o Importing, exporting, and restoring data in the Software;
    o Troubleshooting syncing/portable device connection issues in the Software; and
    o Server and network maintenance (renewing SSL certificates, replacing hard drives, etc.) in the Software.

- **Level 3 Support – Charged hourly at the rates below:**

    o Writing scripts for triggers, custom exports, custom maintenance, and custom actions in the Software;
    o Writing external add-ons, modules, executables, and mobile apps for the Software; and
    o Modifying codebase for web/iOS/android for the Software.

- **Hourly rates (charged in hourly increments with a minimum charge of one (1) hour):**

    o **Level 1:**   $0.00

    o **Level 2:**   $85.00 per hour

    o **Level 3:**   $175.00 per hour

Civil Case No. 8:21-CV-00507
EXHIBIT D

| EXHIBIT C |
|:---:|
| PERMITTED HOST PRODUCTS |

1) TraxisPro*

2) FMSurvey *

3) BLExecution *^^

*Or any other name utilized by such platform after the Effective Date of the Agreement.

**Subject to Company's prior written consent, which shall be in Company's sole discretion, Host may offer additional Products using the Software, which shall be subject to all of the terms and conditions of this Agreement, including, without limitation, the fees set forth in Exhibit B to this Agreement. In the event any additional Products offered by Host are approved as provided herein, the Parties shall amend this Exhibit C in accordance with Section 12.2 in order to identify such additional Products.

^^So long as Big Lots Stores, Inc. is the sole End-User of this Product at all times during the term of the Agreement, this Product will be provided to Host free of charge from the License Fees set forth in Exhibit B to this Agreement; however, Host shall still remain responsible for paying (and shall timely pay) the support and development fees set forth in Exhibit B to this Agreement with respect to this Product. If any End-User (other than Big Lots Stores, Inc.) ever uses this Product, then this Product shall immediately be subject to (and Host shall pay for) all fees required under the Agreement, including, without limitation, the License Fees set forth in Exhibit B to this Agreement, for the remaining term or earlier termination of the Agreement.

Civil Case No. 8:21-CV-00507
EXHIBIT D

**EXHIBIT D**

**TRADENAMES**

1. **API SYSTEMS, INC.**

2. **API SYSTEMS**

3. **nFormz**

Civil Case No. 8:21-CV-00507
EXHIBIT D